25

# EXHIBIT 2

# [Signed Declaration]

_____ FILED _____ ENTERED
_____ LOGGED _____ RECEIVED

AUG 1 5 2018

AT BALTIMORE
CLERK, U.S. DISTRICT COURT
DISTRICT OF MARYLAND
BY                              DEPUTY

AUSA Tana Delibeld

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND

**IN THE MATTER OF:**  :
**Quad Avenue Chemical and**  :
**Bio Fuels Site**  :  **18 - 2 1 1 2 JMC**
**6624-6630 Quad Avenue**  :
**Baltimore, Maryland 21237-1221**  :  **Docket No.**_____
**Parcel No. 26-18-6235-018**  :
 :

## DECLARATION OF KELLEY A. CHASE

I, Kelley A. Chase, do hereby make the following declaration:

1.     I am currently employed by the United States Environmental

Protection Agency ("EPA"), Region III, as an On-Scene Coordinator

("OSC") in the Eastern Response Branch, Office of Preparedness and

Response, Hazardous Site Cleanup Division.  I have been employed in my

current position since January 2011.

2.     OSCs are responsible for, among other things, investigating and

assessing releases of hazardous substances and pollutants and contaminants

under the Comprehensive Environmental Response, Compensation, and

Liability Act of 1980, as amended ("CERCLA"), 42 U.S.C. §§ 9601-9675,

and subpart E of the National Oil and Hazardous Substances Pollution

1

ᴛᴅ

18 - 2 1 1 2 JMC

Contingency Plan, 40 C.F.R. Part 300 ("NCP"), to determine whether further investigation and/or other response is warranted.

3.    I received a Bachelor of Science Degree in Environmental Sciences/Studies in May 1990 from Rutgers, The State University of New Jersey, New Brunswick, New Jersey.

4.    I was assigned as the OSC for the Quad Avenue Chemical and Bio Fuels Site ("Site") in or around May 2018, and currently serve as the OSC for this Site. The Site is located at 6624-6630 Quad Avenue, Baltimore, Maryland, 21237.

5.    My review of information in EPA's files reveals the following:

a.    The Site presently consists of a parcel designated in the land records of the City of Baltimore, Maryland as Parcel No. 26-18-6235-018 containing 1.10 acres of land. The land records of the City of Baltimore, Maryland indicate the parcel has a street address of 6624-6630 Quad Avenue.

b.    There are two commercial buildings on the Site referred to by Baltimore officials as the "east building" or "6630 Quad Ave" and the "west building" or "6624 Quad Ave". The two buildings are joined by a shared loading dock. With the exception of a paved parking lot in the front, the property is surrounded by fencing on all sides.

2

18 - 2 1 1 2 JMC

c.     The Site was used by the Haven Corporation (formerly known as Haven Chemical Corporation) beginning in 1979.  The Site was also used by Freestate Bio Fuels and Eagle Creek Fuel Services.

d.     On May 8, 2012, ownership of the Site parcel was transferred by deed from Ann Lux Benet Yellott and Ann Lux Yellott to Kinloch Nelson Yellott, III.

e.     EPA's review of the land records for the Site designated as Parcel No. 26-18-6235-018 indicates that Kinloch Nelson Yellott, III is the owner of the Site.

f.     On May 1, 2018, Judge Rachel Skolnik of the Maryland District Court of Baltimore City issued a "Search and Seizure Warrant" for property identified as "6630 Quad Avenue, Baltimore, MD 21237" to "Department of Housing and Community Development—Permit & Code Enforcement—Special Investigations Unit, Investigator I, Daniel Reiner." The warrant application was supported by an affidavit from Baltimore Department of Housing and Community Development ("DHCD") Investigator Daniel Reiner ("Investigator Reiner").  Investigator Reiner's affidavit stated, among other things, that:

(i)     DHCD had been contacted by an investigator from the Maryland Department of Environment ("MDE") who advised DHCD

3

18 - 2 1 1 2 JMC

that the vacant property contained numerous chemicals and substances and

that numerous attempts to reach the owner were unsuccessful;

      (ii)    Investigator Reiner made several attempts to

contact the owner with no success;

      (iii)    On April 18, 2018, Investigator Reiner inspected

the property and found:

> "numerous storage drums containing hazardous materials such as
> EPIOL-ME701; this material is considered hazardous per the National
> Center for Biotechnology Information and the National Institute of
> Health. This material is a combustible fire hazard, a skin & respiratory
> tract irritant, is suspected of causing genetic defects and can
> presumably for explosive peroxides when reacted with acids, amines,
> bases and strong oxidants. Numerous drums were observed labeled
> 'environmentally hazardous substance'. One portion of the property
> contained more than one hundred unlabeled fifty-five gallon drums,
> contents unknown. A number of drums were labeled 'biofuels'. Per
> OSHA, biofuels are combustible, flammable and their manufacture
> can involve potentially dangerous chemical reactions. One portion of
> the property contained a metal fifty-five gallon drum filled with motor
> oil, leaking onto the ground; numerous used and leaking motor oil
> containers were also visible. [Investigator Reiner] observed through a
> window a number of unknown chemicals, all labeled with hazardous
> material warnings. [Investigator Reiner] also observed the property to
> be open to casual entry."

      g.    On Wednesday, May 2, 2018, Investigator Reiner

conducted a search of the property pursuant to the state court search warrant.

In attendance were, among others, a second Baltimore City DHCD-SIU

Investigator, a Baltimore City DHCD Building Inspector, members of the

Baltimore City Fire Department (BCFD) including members of the

4

Ⲧⅅ

18 - 2 1 1 2 JMC

Hazardous Materials Team (Hazmat) and Fire Prevention Section, and the

City of Baltimore Mayor's Office of Emergency Management.  A May 4,

2018 report of the search by Investigator Reiner included the following:

> "Upon entry to the east building, I observed the property
> abandoned and open to casual entry. As I entered the building, I
> walked into an office section; this portion of the building was full
> of business records such as but not limited to purchase orders,
> correspondence, billing statements and tax returns. The vast
> majority of these records were addressed to Kinloch Yellott III, as
> well as *Haven Corporation* and *Haven Chemical Corporation* . . .

> "As I walked to the rear of the property I found a large warehouse
> filled with numerous barrels, both marked and unmarked, stacked
> two to three in height upon one another. The BFD Hazmat team
> conducted air and gas testing in order to ensure it was safe to
> continue a search of the premises. Hazmat did not find any
> immediate concerns but noted that the warehouse was full of
> dangerous and hazardous chemicals. Hazmat advised that these
> chemicals posed a serious threat to the health, life and safety of
> anyone in the immediate area as many were highly flammable and
> combustible. Furthermore, Hazmat advised they could not be sure
> what was in all of the barrels without extensive testing.

> "After completing a search of the warehouse portion I exited onto
> the shared loading dock where we found hundreds of leaking
> barrels. Hazmat determined the vast majority of these barrels to be
> leaking vegetable grease, which is often the by-product of biofuel
> production.

> "Upon completion of searching this section, we made entry into
> the west building. As I opened the door, I found the property to
> have been sealed shut with plastic lining. After removing the
> lining, a strong chemical odor was present inside of the property.
> Hazmat conducted air and gas testing and confirmed safe [sic] for
> us to continue our search. The layout of this building was similar
> to the east building; an office area led into a large warehouse. The
> west building warehouse was very similar to the east side;

18 - 2 1 1 2 JMC

numerous marked and unmarked barrels were stacked two and three high through the warehouse. Hazmat once again determined numerous materials inside of the warehouse to be hazardous. Throughout the property, there were at least one thousand barrels, contents unknown.

"At this time, I noticed a number of potential structural issues and a building inspector was summoned to the scene. Chief Wallace also placed a call to the Fire Prevent [sic] Section and a Fire Prevention Inspector was summoned. Chief Wallace was very concerned about the potential of a serious fire at the location, advising that a fire at this location would likely be 'a seven alarm' fire and catastrophic to the area, from both a fire and environmental impact.

. . .

"BFD Fire Prevention Inspector Banks and DHCD Building Inspector Santana arrived on scene. After a comprehensive inspection, both Inspectors determined the property to be an unsafe structure. Inspector Banks issued a 'Cease & Desist' under IFC 110.1.1. Inspector Santana condemned the property and issued a condemnation notice on the property.

. . .

"At the conclusion of the search of the property, the property was secured and boarded by a Baltimore Department of Public Works Boarding Crew. There were no items seized or removed from the property.

"Due to the immense amount of chemicals onsite and the potential for serious health, life and safety impact to the surround area, this property is being referred to the Maryland Department of the Environmental [sic] and the Environmental Protection Agency for further action."

6

18 - 2 1 1 2 JMC

h.   A report by Robert Atkinson, BCFD Hazardous

Materials Coordinator #2 for the BCFD Hazmat, regarding the May 2, 2018

search of the Site included the following:

> "The property consisted of two large warehouses connected by a
> loading dock that was secured by a locked fence. The Housing
> Department opened the gate and four members of the BCFD
> Hazmat Response Team entered the property. On the loading dock
> there was an estimated one hundred drums. Upon reaching the
> loading dock a strong smell of vegetable oil [sic]. The loading
> dock was covered in what appeared to be vegetable oil. The
> majority of the drums were metal and unmarked. There were
> drums that were marked with corrosive labels. There were also
> drums that were distended, corroded, and showed signs of fatigue.
>
> "The loading dock led to a large area behind the warehouses. In the
> rear of the warehouse were more drums containing unknown
> substances. There were also three 250 gallon totes. These totes
> appeared to contain vegetable oil. It was also noted that there were
> two acetylene tanks as well as one small propane tank laying
> horizontal and likely empty. While the condition of some of the
> drums was poor, it appeared that none were leaking. Air sampling
> was conducted and all readings were within normal limits."

Mr. Atkinson's report of the entry into the warehouse at the rear of the east

building (6630 Quad Avenue), included the following:

> "Inside the warehouse there appeared to be over one hundred 55
> gallon drums. There [sic] drums appeared to contain various types
> of materials. A large amount of the drums were marked epoxy.
> Some of these drums also had NFPA 704 markings attached to
> them. The fire risks on these marked drums were 2 and the health
> risk were marked 2 as well. There were various types of alcohols
> in fifty five gallon drums as well. All drums appeared to be sealed,
> and not leaking. Some of the drums were in poor condition. Air
> sampling was conducted in the warehouse and all readings were
> within normal limits."

7

18 - 2 1 1 2 JMC

Mr. Atkinson's report of the entry into the west building,

included the following:

> "The BCFD team entered the second warehouse, 6624 Quad Ave with
> the Housing Department to investigate the warehouse. Inside this
> warehouse there appeared to be over one hundred 55 gallon drums.
> This warehouse appeared to have the same types of materials that
> 6630 Quad Ave had stored inside. There were several pallets of metal
> drums stacked on top of each other. It was noted the building had a
> hole in the roof with a central air conditioning unit resting on a truss.
> Air sampling was conducted and all readings were within normal
> limits.

> "Both warehouses contained laboratories. Both warehouses also
> contained various sizes of containers, from smaller sample size
> containers, 5 gallon carboy containers, as well as 55 gallon drums.
> The chemicals that were observed in both warehouses were consistent
> with chemicals used in multiple process [sic] and indicated multiple
> occupants over a period."

6.     On April 19, 2018, I received an email from OSC Fitzsimmons,

another EPA Region III OSC, regarding a potential site located at 6630

Quad Avenue, Rosedale, Maryland.

7.     On April 24, 2018, I sent an email to Geoffrey Donahue, Chief,

Emergency Response Division at MDE, to discuss the Site and offered

EPA's assistance to conduct a site visit and assessment, if needed.

8.     On May 4, 2018, OSC Fitzsimmons sent an email to me which

included photos from the search conducted by the Baltimore City Housing

8

18 - 2 1 1 2 JMC
Authority on May 2, 2018.  The email indicated that based on the search the

City estimates that over one thousand drums were onsite.

9.     On May 5, 2018, I received an email from OSC Fitzsimmons

containing an email thread which included a request from the City of

Baltimore to the MDE for assistance in removing hazardous material from a

building at the Site.

10.     On May 7, 2018, I called and emailed Geoffrey Donahue at

MDE to offer EPA's assistance.

11.  On May 7, 2018, I received an email from Mr. Donahue of MDE

requesting that I call him the next day, May 8, 2018, to discuss the City's

request.

12.  On May 8, 2018, I telephoned Mr. Donahue who indicated that,

based on the volume of chemicals stored at the Site, it was unlikely that

MDE would have the resources to respond.  Mr. Donahue suggested a

meeting with the City of Baltimore, MDE, and EPA to discuss the City's

request for assistance in the cleanup of the Site.

13.  On May 9, 2018, I spoke briefly with Site owner Kinloch N.

Yellott, III, by telephone to discuss the conditions observed by Baltimore

officials and to request consent for entry to perform an assessment of

18 - 2 1 1 2 JMC

environmental conditions by EPA at the Site. Mr. Yellott indicated that he did not believe that he still owned the property as it was sold in a tax sale.

14. On May 10, 2018, I met with representatives from the City of Baltimore and the State of Maryland, including MDE. At that meeting, MDE and the City of Baltimore requested EPA's assistance to address the potential threats posed by the large volume of hazardous substances at the Site. Maryland officials provided me with copies of digital photographs taken by the City of Baltimore at the Site. These photographs showed labels on drums and other containers. Some of the labels read "KUKDO EPOXY"; "ENVIRONMENTALLY HAZARDOUS SUBSTANCE, LIQUID, N.O.S. (Diglycidyl Ether of Bisphenol A)"; "TRIETHYLENE GLYCOL"; "BENZYL ALCOHOL SOLVENT"; "METHANOL", "FLAMMABLE LIQUID"; "AALCHEM 62", "o-Cresyl Glycidyl Ether"; "HEXYLENE GLYCOL"; "Diethylene Glycol, Mono Ethyl Ether"; "METHANOL RACING FUEL", "FLAMMABLE LIQUID"; "BUTYL CELLOSOLVE ACETATE"; "HJ EPITOL – ME 701 (CGE) "; "Dibutyl Phthalate", "HEXYLENE GLYCOL (RHODIA)"; "EC-122R HARDENER"; and "FREESTATE BIO FUELS", "Waste Vegetable Oil".

15. On May 14, 2018, I called Mr. Yellott again to request entry to the Site but did not speak with him directly. I left Mr. Yellott a voicemail

18 - 2 1 1 2 JMC

message asking him to return my telephone call regarding consent for entry
to the Site.

16.  On May 15, 2018, I called Mr. Yellott again to request entry to
the Site, but did not speak with him directly.  I left Mr. Yellott a second
voicemail message asking him to return my telephone call.  I also sent an
email message to Mr. Yellott requesting his consent for entry to the Site.
My email included a written consent form for his signature.

17.    On May 17, 2018, EPA Senior Assistant Regional Counsel
Yvette Hamilton copied me on an email she sent that day to Mr. Yellott.
Attached to the email was a copy of a letter to Mr. Yellott formally
requesting consent to enter the property for purposes of assessing and
documenting the nature and extent of any threat to human health and the
environment presented by conditions at the Site.  Ms. Hamilton included a
consent for entry form for signature by a person authorized to provide
consent.  I subsequently learned that Ms. Hamilton had also sent a copy of
the letter via UPS overnight mail to Mr. Yellott's residence in Monkton,
Maryland on May 16, 2018.

18.  On May 17, 2018, Ms. Hamilton sent me an email forwarding a
UPS email delivery notification that her letter was delivered to Mr. Yellott's
residence on May 17, 2018 at 3:09 pm.

11

19. Ms. Hamilton has advised me that, as of the date of this declaration, she has not received a response to her May 17, 2018 letter or email.

20. On May 22, 2018, Mr. Yellott contacted me by telephone. During his conversation with me, Mr. Yellott stated that he did not receive the consent for entry form nor any other communication from Ms. Hamilton. I stated that I previously emailed the consent form to him but Mr. Yellott stated that the email address the form was sent to was incorrect. Mr. Yellott provided me with an alternative email address to send him another consent form for his review. Mr. Yellott indicated that he would be willing to meet me at the Site. Mr. Yellott and I made plans to meet at the Site on May 30, 2018. After our phone conversation, I sent a copy of the consent form to Mr. Yellott via email at the new email address Mr. Yellott provided to me during that telephone call.

21. On May 23, 2018, the Baltimore City DHCD-SIU notified me via email that Investigator Reiner had observed that the front gate that he had secured with a lock and chain following the search on May 2, 2018 had been cut and that several vehicles that had previously been stored on the property had been removed. According to the email, Investigator Reiner

12

18 - 2 1 1 2 JMC

also observed that some containers had been tipped over and contents had poured out leaving a black stain on the ground in multiple areas.

22.    After reviewing the May 23, 2018 email from the Baltimore City DHCD-SIU, I contacted Mr. Yellott to inform him of its contents and to stress the urgent need for an assessment of the property.  During that conversation, Mr. Yellott did not agree to provide consent for entry to the property but agreed to meet me at the Site on the following day, May 24, 2018, to walk throughout the property, observe current conditions at the Site, and to discuss proposed assessment activities.

23.    On May 24, 2018, I met with Mr. Yellott, Investigator Reiner, representatives from MDE, and EPA contractors at the Site.

a. At that time, Mr. Yellott would not agree to sign the consent form.  However, he verbally gave permission to EPA and the others to enter the property to observe and document the conditions at the property.  EPA's contractor personnel were present to conduct health and safety monitoring, take photographs, and otherwise document conditions at the property.

b. I walked throughout the Site with Mr. Yellott and others and observed overturned containers and staining on the ground near the fence on the eastern side of the property where, according to Investigator Reiner, several vehicles that had previously been found at the Site during the City's

13

18 - 2 1 1 2 JMC

May 2, 2018 search had been removed. I also observed large and small

containers and 55-gallon drums spread across the property and stacked in the

loading dock area. Some of the containers were open and appeared to

contain a black oil-like liquid. Portions of the loading dock were covered

with a greasy substance which appeared to have leaked from the drums

stacked nearby. On the loading dock I observed at least one drum labeled

"METHANOL" and "FLAMMABLE LIQUID".

     c. The group entered the two buildings through doors located at

the back and side of the buildings. Inside the warehouses I observed

hundreds and likely more than a thousand drums, totes, and various other

containers, many of which were in a deteriorated condition. Steel 55-gallon

drums were stacked two or three high. Each building contained office

spaces, some of which contained shelves and storage cabinets where

numerous small containers of unknown chemicals were stored.

     d. Some of the drums and containers at the Site were labeled

but many were not. I observed labels identifying some contents as

flammable and other contents as corrosive. I also observed several labels

identifying the contents as epoxy.

     e. I observed both buildings to be in very poor condition. The

roof of the west building had a large hole where an air conditioning unit had

18 - 2 1 1 2 JMC

broken through and was resting on a truss. There were drums and other

containers stored in areas where the roof was compromised and exposed to

the weather. Some of the containers appeared to be damaged due to

exposure to water and possibly due to freezing during the winter. Several

doors of at least one of the buildings were not closed properly due to the

buckling floor. There was no electricity in either building. Mr. Yellott

indicated that electricity to the buildings had been off for at least two years.

Mr. Yellott also indicated that he had not been on the property for at least

two years.

  f. I estimate that I observed more than one thousand drums

and other containers throughout the Site. Steel 55-gallon drums were

stacked two to three high in the warehouses and on the outside loading dock.

Drums, totes, tanks and other storage containers were also scattered around

the grounds of the property. Many of the containers were in poor condition.

  g. During the Site visit Mr. Yellott told me that his family

moved their business, Haven Corporation (formerly Haven Chemical

Corporation) to the property in 1979. According to Mr. Yellott, operations

at that time primarily involved development and manufacturing of epoxy

floor coatings. Mr. Yellott indicated that the majority of the materials in the

warehouses would have been associated with the floor coatings business.

18 - 2 1 1 2 JMC

According to Mr. Yellott, earlier business operations involved the

production of the green epoxy coatings used in printed circuit boards.

However, he did not indicate whether operations at this location involved

manufacture of the epoxy used in the circuit boards. He indicated that more

recent manufacturing activities at the property were related to the production

of bio-fuels and that the drums and materials on the loading dock would

have been associated with the production of bio-fuels. According to Mr.

Yellott, these operations involved two companies--Freestate Bio Fuels and

Eagle Creek Fuel Services. Mr. Yellott indicated that both companies leased

a portion of the Site to produce bio-fuels and that bio-fuel operations at the

property ceased around 2014.

   h. Before leaving the Site, I advised Mr. Yellott that, based on

my observations at the property, there was a high risk of trespass and

vandalism at the Site and that the potential for a fire was a significant

concern. I also noted that the large amount of chemicals at the Site

presented a threat. I indicated that I would recommend to my management

that EPA initiate a response action to secure the property and conduct a

cleanup.

   24. On May 25, 2018, I transmitted an email informing officials at the

City of Baltimore and MDE that following the Site visit on May 24, 2018 I

16

18 - 2 1 1 2 JMC

had recommended that EPA take a response action to address the potential

threat to human health, welfare and the environment presented by conditions

at the Site.

25.     On May 30, 2018, I sent Mr. Yellott an email which included a

revised consent form authorizing entry to among other things, secure the

property; stabilize, characterize, and segregate hazardous substances found in

containers; and, if needed, clean up any materials that may have spilled or

leaked from the containers.  I also called Mr. Yellott and left him a voicemail

message requesting a return telephone call.  He did not return either my

telephone call or respond to my email communication.

26.     On June 1, 2018, I sent another email request for access to the

Site and indicated that Mr. Yellott should contact me by the close of

business on Monday, June 4, 2018, or EPA would pursue other options to

obtain access to the property.  He did not return either my telephone call or

respond to my email communication.

27.     On June 11, 2018, I called Mr. Yellott and left him a voicemail

message regarding access to the Site and requested a return telephone call.  I

also sent Mr. Yellott a final email request for access and again requested that

Mr. Yellott contact me.  He did not return either my telephone call or

respond to my email communication.

28.     On June 19, 2018, I received a draft report from the EPA contractor summarizing the May 24, 2018 Site visit.  The report contained photographs taken of, among other things, labels on drums and other containers. The photographs show labels on drums and other containers reading "METHANOL", "FLAMMABLE LIQUID"; "EPIKURE™  Curing Agent 3230", CORROSIVE; "HYDROQUINONE", "TOXIC"; "DIOCTYL PHTHALATE"; "TRIETHYLENE GLYCOL"; "Pentaerythritol" "Tetra 3-Mercaptopropic" and "DIBUTYL PHTHALATE".

29.     As of the date of this Declaration I have received no further contact from Mr. Yellott.

30.  Subsequent to the May 24, 2018 Site visit, I documented the activities conducted by the City of Baltimore and the May 24, 2018 joint visit to the Site in a "Request for Funding for a Time-Critical Removal Action" memorandum ("Action Memorandum") seeking CERCLA funding for, and approval to initiate, a Removal Action to address a release or threat of release of hazardous substances, pollutants, or contaminants from the Site. On June 21, 2018, the Director of the EPA Region III Hazardous Site Cleanup Division approved the request.  The selected actions outlined in the Action Memorandum included, among other things, securing the east and west buildings to make them safe for responders and protected from

18 - 2 1 1 2 JMC

trespassers and weather, characterization and segregation of wastes,

stabilization of leaking containers, cleaning up spills, preparation of wastes

for off-site disposal, and off-site disposal of wastes.

31.   I have a reasonable basis to believe there is a release or threat of

release of hazardous substances from the Site into the environment.

Specifically:

a.   The Site was an industrial facility that has been

unoccupied for at least two years;

b.   Although the Site is partially fenced, access by

unauthorized persons is not completely restricted;

c.   A large quantity of drums, totes, and other containers

containing unknown substances are present at the Site.  Many of these

containers are in poor condition and there is evidence that some of these may

have spilled and/or may be leaking their contents.

d.   Labeling indicates some of the drums and other

containers contain "KUKDO EPOXY", "ENVIRONMENTALLY

HAZARDOUS SUBSTANCE, LIQUID, N.O.S. (Diglycidyl Ether of

Bisphenol A)"; "TRIETHYLENE GLYCOL"; "BENZYL ALCOHOL

SOLVENT"; "METHANOL", "FLAMMABLE LIQUID"; "AALCHEM

62", "o-Cresyl Glycidyl Ether"; "HEXYLENE GLYCOL"; "Diethylene

19

18 - 2 1 1 2 JMC

Glycol, Mono Ethyl Ether"; "METHANOL RACING FUEL",

"FLAMMABLE LIQUID"; "BUTYL CELLOSOLVE ACETATE"; "HJ

EPITOL – ME 701 (CGE) "; "Dibutyl Phthalate", "HEXYLENE GLYCOL

(RHODIA)"; "EC-122R HARDENER"; "FREESTATE BIO FUELS",

"Waste Vegetable Oil"; "EPIKURE™ Curing Agent 3230", CORROSIVE;

"HYDROQUINONE", "TOXIC"; "DIOCTYL PHTHALATE"; and

"Pentaerythritol" "Tetra 3-Mercaptopropic". Certain drums and containers

are labeled to contain flammable or corrosive materials. I suspect that at

least some, and possibly many, of the unlabeled drums and containers at the

Site contain these and other chemicals. Without conducting extensive

sampling, the exact contents of the drums and containers are unknown.

   e. Methanol, glycol ethers including diethylene glycol, dibutyl

phthalate, dioctyl phthalate, butyl acetate and hydroquinone are CERCLA

hazardous substances and are so listed at 40 CFR § 302.4.

   f. Many of the drums and other containers at the Site are

deteriorated and some are leaking. Many of the drums are stored in the

buildings which permit wind, rain, and other weather to come into contact

with them. Further deterioration of drums and containers may cause their

contents to be released.

18 - 2 1 1 2 JMC

g. Given the conditions of the buildings and the containers themselves, as well as the potential for trespass or vandalism, there is a significant risk of fire at the Site. A fire, whether started naturally or by unauthorized visitors, could result in a release or further release of hazardous substances from drums and/or other containers.

h.     The Site is not fully secured which would permit unauthorized persons to enter the Site and come into contact with, and potentially remove or spread, intentionally or by accident, the drummed substances, including those that may contain hazardous substances.

32.     The Site is a place from which or to which a hazardous substance or pollutant or contaminant has been or may have been released, a place where such a release is or may be threatened, and a place where entry is needed to effectuate a response action.

33. Access to the Site is necessary for purposes of taking a response action. Included among the actions which are needed to abate the most immediate threats at the Site are:

a.     Provide security to limit access to the hazardous substances, pollutants, or contaminants at the Site;

b.     Secure the buildings and structures. This may include securing doors, windows and other entryways from trespass; making the

21

18 - 2 1 1 2 JMC

buildings and structures safe for conducting the response action; covering

holes in the roofs to prevent or limit rainwater from entering the buildings

in places where it may impact hazardous substances, pollutants, or

contaminants;

      c.     Characterize and sample to determine the content of

drums and other containers at the Site;

      d.     Stabilize leaking drums, tanks, totes, and other

containers to prevent the release or threatened release of hazardous

substances, pollutants, or contaminants;

      e.     Clean up spills from leaking drums, tanks and other

containers, as needed, to prevent further release of hazardous substances,

pollutants, or contaminants;

      f.     Characterize, sample and segregate, for future off-site

disposal, all hazardous substances, pollutants or contaminants in drums,

tanks, totes, and other containers; associated contaminated materials that

may pose a threat; and materials and/or debris that may impede response

actions;

      g.     Take such other samples as may be appropriate in order

to assess and evaluate the release or threatened release of hazardous

substances or pollutants or contaminants at and from the Site; and

18 - 2 1 1 2 JMC

h.    Sample, overpack, transfer, consolidate, or otherwise prepare the hazardous substances, pollutants, and/or contaminants identified for removal and off-Site disposal.

34.    As of the date of this Declaration, EPA has been unable to obtain consent from Mr. Kinloch N. Yellott, III to enter the Site to conduct necessary response action.

35.    I estimate that EPA can start the work outlined in Paragraph 33 within thirty (30) calendar days from the date access is obtained and complete the work within ninety (90) calendar days from the date EPA starts work.

36.    Further access to the Site will be required at a later date to remove, for off-site disposal, the stabilized wastes and debris left on the Site following completion of the work described in Paragraph 33.

I declare under penalty of perjury that the foregoing is true and correct.

*Kelley A. Chase*

Kelley A. Chase, On-Scene Coordinator
U.S. Environmental Protection Agency, Region III
Eastern Response Branch
Office of Preparedness and Response
Hazardous Site Cleanup Division

Date: 8/2/18

23